THE OCEAN STEAMSHIP COMPANY OF SAVANNAH *v.* WAY. | 90 747 | 94 341 |

1. Construing section 4281 of the Revised Statutes of the United States (requiring shippers of certain articles to give to carriers by vessel written notice of the true character and value thereof) in the light of judicial decisions upon the English statute, of which that section is in most respects a substantial copy, fans and parasols made of delicate and expensive materials, ornamented with carving, fragile in construction and intended more for ornament than for use, although possessing to some extent the quality of · utility, are "trinkets" in the sense in which this word is used in that section. Though constituting a part of a lady's paraphernalia, such articles are not clothing; and when shipped by vessel, written notice of their character and value must be given.
2. The word "lace" in the section cited includes a lady's shawl made exclusively of Chantilly lace.
3. The verdict being for a much larger amount than the plaintiff, under the evidence and the law applicable thereto, was entitled to recover, should have been set aside, and the court erred in not granting a new trial.

February 9, 1893.

Construction of statute. Words. Carriage by sea. Damages. Before Judge HARDEN. City court of Savannah. November term, 1891.

Mrs. Way sued the steamship company for $1,000 damages from the negligent transportation of a cedar chest containing valuable goods, by which alleged negligence the chest and its contents were broken and injured. Among the contents for which damage was claimed were, a Chantilly lace shawl valued at $400, and several fans and parasols valued at $310. The evidence indicates that these latter were ruined, that the shawl could be repaired for $200, and that the chest was worth $12 and was rendered useless. The jury found for plaintiff $500, and the defendant excepted to the refusal of a new trial.

It appears from the evidence that Way, the plaintiff's husband, after carefully packing the chest in New York, delivered it, together with some trunks, to Crowe's Ex-

press to be taken to the defendant's steamer in that city. He did not know where to get blank dray tickets; so he took a sheet of paper and wrote, "Received from Charlton H. Way, to be shipped by steamship City of Savannah, consigned to C. H. Olmstead, Savannah, Ga., one chest and three trunks containing personal effects." He told the drayman from the express company he would have to take that down and procure him a bill of lading for the goods. The drayman took the chest down, and Way called at the express office next day to get his bill of lading. Instead of getting it he was handed the ticket which he had written, he thought, in duplicate, with the company's stamp upon it and with the name of the clerk underneath. That paper is lost, and he has never been able to find it. He is positive the language in that ticket was "personal effects." There was no value stated upon the paper, and none was ever asked so far as he has heard. In his judgment "personal effects" was a proper description of all the articles, including valuable china which was in the chest, and he could have insured them under that name; they were not so described for the purpose of deceiving defendant; he did not know whether any demand was made upon the agent he sent down to the wharf, for the value of the contents of the chest, because he did not go himself; he asked Crowe's Express to instruct the agent of defendant to insure them for $1,000. The other trunks contained clothing and some little articles about the house. The chest contained upwards of $2,250 worth of stuff, but he only asked them to insure the four pieces for $1,000.

The defendant introduced what was claimed to be the duplicate receipt on which the chest was received from New York, given to the agent of defendant at Savannah by the purser who brought the goods from New York, and which was the receipt on which the billing

was made; and introduced testimony that there was a difference in the rate on bric-a-brac and clothing, and a difference in the rate between clothing and personal effects. In the duplicate receipt the articles were stated to be "three trunks clothing" and "one chest clothing." Way testified that he never saw this receipt until it was shown him in Savannah when he made claim for damages, and never authorized Crowe's Express to change the form of the bill of lading that he sent by the drayman; that the express people were his agents to take the goods to the defendant, ship them and instruct the agent to insure them, but were not his agents to disobey instructions.

The motion for new trial contains the grounds that the verdict was contrary to law and evidence, and was excessive; that the court erred in refusing to charge the jury that the Chantilly lace shawl could not be recovered for, unless the defendant or its agents were notified of its character and value at the time of its shipment, and the character and value thereof entered upon the bill of lading; and that the court erred in charging as follows: "Next, we come to the question of 'lace.' The word lace I must construe there to mean lace as lace, lace kept as lace, and not lace which has become simply a material in something else and which has been so changed that we cannot describe the articles by calling it lace, but we have to call it something else. Thus, a lady's undergarments may be trimmed profusely with lace, and although the lace is a part of the undergarment, they cannot be described as lace, and as with the undergarments so with the outside dress. Ladies' dresses are frequently profusely trimmed with lace, but I think that even if she enters them in the custom house she would not have to enter them as lace as well as clothing. I think that clearly this is meant to cover only those articles which are fully described by the word lace. As

counsel for plaintiff urged this morning, if a lady were to go and buy a quantity of lace and bring it here for use, that would be within the meaning of it, but while it does not cease to be lace because it is attached to a dress and made a part of it, yet it becomes something more than lace and it cannot be described simply as lace. The question, of course, is not without its difficulties, for even in the case just mentioned this distinction arises, I think: If a man is a dealer in lace or in lace goods, and he were to pack up a shawl of that character, something of great value and small bulk, I think it would be his duty to notify the person by whom it was to be carried, of the character and value of the goods shipped, or he could not recover under that act, even though it might be a shawl; but when that shawl ceases to be a part of the stock in trade of a lace dealer and is sold and becomes a part of the wearing apparel of the shipper, it seems to me that the rule must necessarily change, and it then becomes a part of the wearing apparel, whether it be called clothing or personal effects. If I should have a half dozen silk stockings in my trunk, I would not be required to say that I have a half dozen pieces of silk, and if I have a half dozen silk ties in my trunk I would not have to describe them as six pieces of silk. Every man knows necessarily that the baggage of people varies in character according to the class of people to whom it belongs, and when they take it for transportation they take it knowing that it may be worth a great deal or it may be worth very little. I take it for granted that a lady's trunk and luggage would naturally be much more valuable than a man's trunk and luggage, just as a rich man's trunks are likely to be more valuable than those of a poor man. Therefore I say it is that, notwithstanding this shawl is entirely of lace, it had ceased to be lace within the meaning of that statute of the United States and has become

a part of the personal effects. And right here this suggests the idea to me, suppose it is silk lace, under that statute, if I were not correct in my construction, would it be returned as silk or lace, or both?"

Lawton & Cunningham and T. M. Cunningham, Jr., for plaintiff in error.

George A. Mercer & Son, *contra*.

Lumpkin, Justice.

It will appear from the reporter's statement that one of the issues of fact involved in this case was, whether or not the contents of the cedar chest were shipped as "personal effects" or as "clothing." The jury manifestly resolved this question in favor of the plaintiff, whose contention was that the goods were shipped as "personal effects," and accordingly we have dealt with the case from that standpoint.

1. Among the articles alleged to have been damaged were a number of very elaborate fans and parasols. The proof shows that they were made of delicate and expensive materials, highly ornamented with carving, and extremely fragile in construction; and it also shows beyond doubt, we think, that these articles were really intended more for ornament than for use. They may have possessed to some slight extent the quality of utility, but this consideration constituted a very small element of the purpose for which they were designed, and contributed inconsiderably to their value. One of the questions made by the record is, whether or not such articles are "trinkets" in the sense in which that word is used in section 4281 of the Revised Statutes of the United States. The act of Congress embodied in that section was evidently borrowed from the "English Carriers' Act" of 11 G. 4 & 1 W. 4, c. 68. Our act was therefore probably passed in the light of the decisions of the English courts construing the words used in the English act, and it is therefore legitimate

to look to these decisions for the purpose of ascertaining the meaning given to the word "trinkets." Bernstein *v.* Baxendale, 95 Eng. C. L. 251, seems to be a leading case on this question. The following is therein reported as a synopsis of the argument of counsel: "The definition of 'trinket' in all the dictionaries carefully excludes articles of utility, such as these bracelets, brooches and pins, which are mere fastenings for dress. Webster describes it as 'a small ornament, as a jewel, a ring, or the like'; Richardson, 'any small piece of ornament or decoration, of more ornament than use'; and Dr. Johnson, 'ornaments of dress; superfluities of decoration'; and this latter is adopted by Baily." Whereupon Cockburn, C. J., said: "Richardson's definition seems to me to be the best—a thing 'of more ornament than use.' Can a thing be said to be the less an ornament because there may be superadded to it the quality of utility?" And in his opinion construing the word "trinket," he added: "There is a distinction between some of the articles, which are more especially articles of ornament with reference to dress, and others which, though of a somewhat ornamental character, do not constitute ornaments of dress, but are only occasionally produced. As to the former—bracelets, shirt pins, rings and brooches—they are clearly articles of personal decoration and adornment, and literally fall within the description of 'trinkets.' It is said that, inasmuch as they are also articles of utility, they cease to be trinkets. But I do not agree to that. Their main and principal object plainly is that of ornament. It is true they may also be applied to some useful purpose; yet inasmuch as they are essentially ornamental, I do not think the fact of their being capable of being turned to some use raises any difficulty. But, even supposing their main object was utility for the purpose of dress, if made part of the ornament of apparel, they equally fall within

the strictest definition of 'trinkets.' The other articles, viz: the porte-monnaies and the smelling-bottles, are more difficult to deal with. Still, I think that, though not worn so as to be constantly exhibited to view, and though to a certain extent articles of use, and perhaps of necessity, yet, if an ornamental character is given to them to such an extent as to make that their main and primary object, I think they may be fairly and properly considered to fall within the description of 'trinkets' in the general sense of the word. If that may be taken to be the true definition of trinkets generally, a fortiori ought that sense to be given to the word in this act of parliament, the object of which is to protect the carrier against the risk of having to take charge of packages of great value in small compass. In that respect, there can be no difference in point of risk and danger to the carrier; whether the article is designed to be carried in the pocket, or exposed on the dress of the party." Boville, Q. C., referred to the case of Attorney-General v. Harley, 5. Russ. 173, " where 'ivory fan' and 'seals' were held to be 'trinkets.'"

It would seem from the foregoing that fans and parasols of the character involved in the present case may properly be regarded as "trinkets"; and where such articles are shipped by vessel, the masters or owners thereof, under the above mentioned section of the revised statutes, are relieved from liability as carriers in any form or manner, unless the shipper has given a written notice of the true character and value of the articles and had the same entered on the bill of lading thereof. This not having been done, we hold that the steamship company is protected by the law in that section contained.

One meaning often given to the word "trinket" is that it is a mere trifle, possessing but little value. But it seems that to give the word as used in the section under consideration this meaning would be contrary to

v 90 48

the spirit and intention of the law, and tend to defeat one of its main purposes. The preamble of the English act recites that the responsibility of common carriers is greatly increased because of a frequent practice of sending "*articles of great value in small compass,*" and the omission of persons shipping parcels containing such goods to notify the carrier of the nature and value of the contents thereof. To remedy this evil is one of the main purposes of that act, and it will be observed that the enumeration of the various articles to which the act is to apply includes, for the most part, things usually of great value. Hence, it would seem that the term "trinkets" was intended to embrace articles of this character not therein more specifically designated, as there would be little or no occasion to notify and thus protect carriers as to articles of trifling value. Our act evidently had the same spirit and purpose as its English ancestor, and enough has been said to show that it does not use the word "trinkets" with reference to such articles as are of little value.

It follows from what has been said that the plaintiff was not entitled to recover anything from the defendant on account of the destruction of the fans and parasols described in her declaration, except the fan designated as an "ordinary fan," and valued at five dollars.

2. The plaintiff claimed damages for the mutilation of a Chantilly lace shawl valued at four hundred dollars, and the question was made whether or not the word "lace," as used in the section cited, includes an article of this character. We think it does, and this is in accord with the usual and ordinary meaning given to the word. It is customary to speak of handkerchiefs, scarfs, veils and other articles of feminine apparel composed entirely of lace, as "laces." The shawl in question contained no material other than lace, and the fact that it was lace manufactured into the form of a shawl does

not deprive it of its distinctive character as a lace article. Webster describes lace as: "A fabric of fine threads of linen, silk or cotton, interwoven in a net, and often ornamented with figures; a delicate tissue of thread;—worn as an ornament by ladies." Thus it will be seen that "lace" derives its name not from the *materials* which enter into its manufacture, but the term is designed to describe a certain peculiar and delicate *texture* into which may be woven indifferently any one or more of several materials. Nor do such materials, however costly, give to lace any but an inconsiderable value; it is the delicacy, intricacy and beauty of its tissue,—woven at the expense of such immeasurable toil, patience and skill,—that gives to this fabric its chief intrinsic worth. Certainly it cannot be said, because in its manufacture it assumes any distinctive shape, that the intricate and delicate texture which gives to lace its identity, and from which it derives its name, is in any manner impaired or destroyed. So long as this distinctive texture of an article is preserved, thus long is that article properly termed lace.

No reason was suggested in the argument, or now occurs to us, why this shawl might not as well be classified as "lace" as would a piece of crude lace not fashioned into anything of utility or ornament. Upon the idea that it might be designated as "clothing," it may be said, according to the finding by the jury, it was not shipped as such, but as "personal effects." It would be immaterial, however, under the law in question, whether it was shipped under the one designation or the other, for in either event, it was an article of such character and value that the carrier was entitled to have the notice required by law. This view of the question is in accord, we think, with the spirit and purpose of the act to which reference has been made. Of course, there is a distinction between the shipment of such an article as

"freight," and the carrying of it in a trunk or chest by a female passenger as a part of her ordinary " baggage." When carried as baggage the act does not apply. See Carlson *v.* Ocean Steamship Co., 109 N. Y. 359.

3. It is quite clear, in the view we take of this case, that the verdict for $500.00 in favor of the plaintiff cannot be sustained, and consequently the court erred in not setting it aside.          *Judgment reversed.*